**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ruth Bradburn Mitchell, individually and as personal representative of the Estate of Kenneth Mitchell; Kenneth Christopher Mitchell,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>City of Flagstaff; Roy Taylor; Jane Doe Taylor,<br><br>　　　　Defendants. | CV 11-08140-PCT-FJM<br><br>**ORDER** |

The court has before it defendant Roy Taylor's motion for summary judgment on qualified immunity (doc. 39) and separate statement of facts ("DSOF") (doc. 40), plaintiffs' response (doc. 49) and separate statement of controverting facts ("PSOF") (doc. 50), and Taylor's reply (doc. 56) and supplemental statement of facts (doc. 57).

**I**

Where there are disputed issues of material fact, we assume the non-moving party's version of the material facts and draw all reasonable inferences in the non-moving party's favor. Mattos v. Agarano, 661 F.3d 433, 439 (9th Cir. 2011).

On August 25, 2010, a neighbor of plaintiff Kenneth Christopher Mitchell ("Christopher") called 911 to report a domestic disturbance after hearing men in the apartment below him arguing over a shotgun. The Flagstaff Police Department dispatcher

1  notified police officers that the 911 caller heard an argument about grabbing a shotgun.

2  Officers Martinet, Murray, and Taylor arrived on the scene a few minutes later. As
3  the officers approached Christopher's ground-floor apartment, Officer Martinet heard a
4  woman screaming. When the officers arrived at Christopher's apartment, Officer Martinet
5  observed a woman crying and saying "He's going to kill me." The officers heard commotion
6  inside the apartment. Officer Murray knocked on the front door, announcing "Flagstaff
7  Police! Open up!" There was no response.[1] DSOF ¶¶ 3-5.

8  In the meantime, Taylor walked along the corner of the apartment and knocked four
9  to five times on the living room window. He heard more noise inside, and walked farther
10 along the side of the apartment.[2] DSOF ¶¶ 5-6. Taylor looked into a bedroom window. The
11 lights in the bedroom were off, although there was a light on in the hallway. Through the
12 window, Taylor saw Kenneth Mitchell (Christopher's 78 year-old father) pointing a shotgun
13 towards him. DSOF ¶ 7. Plaintiffs deny that Kenneth pointed the shotgun at Taylor. PSOF
14 ¶ 13. Taylor immediately stepped back and stated over his police radio that there was a gun
15 and that more units were needed.

16 After hearing more commotion inside, Taylor looked again through the bedroom
17 window. He saw the silhouette of Kenneth with his back to the window, holding a shotgun.
18 Taylor observed that the gun was pointed directly at Christopher, who was on the ground on
19 his hands and knees. DSOF ¶ 8. Plaintiffs, however, deny that Kenneth was pointing the
20 shotgun at anyone. PSOF ¶ 13. Taylor fired four shots at Kenneth Mitchell, killing him.
21 One of the bullets struck Kenneth in the head. There is no evidence that any of the officers
22 issued verbal warnings or commanded Kenneth to drop the gun.

23 Christopher then picked up the shotgun that his father was holding. He racked it

---

[1] Plaintiffs dispute these facts, but fail to support their assertions as required by Rule 56(c)(1), Fed. R. Civ. P. Accordingly, we consider these facts undisputed for purposes of the motion pursuant to Rule 56(e)(2), Fed. R. Civ. P.

[2] Plaintiffs dispute these facts, but offer no evidentiary support. Thus, we consider these facts undisputed. See Fed. R. Civ. P. Rule 56(e)(2).

several times and pointed it towards Taylor and Officer Murray. Taylor repeatedly commanded Christopher to drop the gun. Christopher eventually complied, crawled out of the apartment, and was taken into custody.[3] DSOF ¶ 12. Christopher later pled guilty to aggravated assault on an officer.

**II**

Taylor argues that he is entitled to qualified immunity on plaintiffs' claim for excessive force under 42 U.S.C. § 1983. The doctrine of qualified immunity shields an officer from liability provided that his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009) (citation omitted). There are two steps to this inquiry that can be completed in either order. We decide whether a constitutional right was violated, and if so, whether that right was clearly established at the time the events unfolded. Mattos, 661 F.3d at 440. A right is clearly established when all reasonable officers would understand that their actions violate that right. Reichle v. Howards, __ U.S. __, 132 S. Ct. 2088, 2093 (2012). Precedent existing at the time of the alleged violation "must have placed the statutory or constitutional question beyond debate." Id. at __, 132 S. Ct. at 2093 (citation omitted).

Taylor first argues that his use of lethal force was objectively reasonable under the Fourth Amendment. In assessing reasonableness of a particular use of force, we ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989). We consider the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396; 109 S. Ct. at

---

[3] Plaintiffs dispute these facts, but do not explain how and offer no evidentiary support. Plaintiffs also offer additional facts, largely without evidentiary support. See PSOF ¶¶ 9-12, 16, 19.

1872; see also Mattos, 661 F.3d at 441. We must judge the reasonableness of the use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," carefully balancing the intrusion on a person's Fourth Amendment interests against the government's interests. Graham, 490 U.S. at 396, 109 S. Ct. at 1871-72.

Here, Taylor's use of force was lethal. He shot four rounds at Kenneth, one of which struck him in the head. In assessing the reasonableness of Taylor's actions, we are mindful that a maximum amount of force was used. See Tennessee v. Garner, 471 U.S. 1, 9, 105 S. Ct. 1694, 1700 (1985) ("The intrusiveness of a seizure by means of deadly force is unmatched.").

Next, we address the severity of the crime at issue. The officers were responding to a 911 call from a neighbor reporting a domestic disturbance involving an argument over grabbing a shotgun. The officers heard commotion inside the apartment. Although plaintiffs argue that Kenneth was not in fact committing a crime when the officers arrived, this is not a case where the dispute was over by the time that the officers arrived. Here, the officers arrived only minutes after the 911 call. They heard commotion inside. Not only was the dispute in progress, it involved an argument over a shotgun. Although by no means dispositive, the situation encountered by the officers in this case provides some support for Taylor's use of force. Cf. Smith v. City of Hemet, 394 F.3d 689, 702-03 (9th Cir. 2005) (crime of domestic abuse provided little basis for use of force where suspect was separated from his wife and had no guns or weapons in his possession when the police arrived).

With respect to the second Graham factor, Kenneth was neither actively resisting arrest nor attempting to evade arrest by escape. At the time that he was shot, he was standing in the bedroom with his back to Taylor. There is no evidence that he moved from this position immediately prior to being shot. Taylor argues that Kenneth failed to comply with police orders because he did not open the door. However, simply ordering someone to open the door is not equal to attempting to place him under arrest. And there is no evidence that Kenneth attempted to flee the apartment. Accordingly, this factor does not support Taylor's use of deadly force.

1      The crux of our analysis is whether Kenneth posed an immediate threat to the safety
2 of officers or others. This is the most important Graham factor. Mattos, 661 F.3d at 441.
3 If there is "probable cause to believe that the suspect poses a threat of serious physical harm,
4 either to the officer or to others," an officer may use deadly force "if necessary to prevent
5 escape, and if, where feasible, some warning has been given." Garner, 471 U.S. at 11-12,
6 105 S. Ct. at 1701. Taylor argues that, under the circumstances, his split-second decision to
7 use deadly force was objectively reasonable. Under Taylor's version of events, when he first
8 looked through the bedroom window, he observed Kenneth pointing a shotgun at him. The
9 next time he looked through the window, he saw Kenneth pointing the shotgun at
10 Christopher, who was crouched on the floor. Taylor argues that under these circumstances,
11 he reasonably believed that Kenneth posed an immediate threat to Christopher's safety, and
12 thus his split-second decision to shoot Kenneth in order to save Christopher was objectively
13 reasonable. Plaintiffs concede that Kenneth was holding the shotgun when he was shot.
14 They deny, however, that he ever pointed the gun at either Taylor or Christopher.

15      How this factual dispute is resolved directly affects whether Taylor's actions were
16 objectively reasonable. A fact finder could conclude that Kenneth was not pointing his gun
17 at Christopher, and thus Taylor did not have probable cause to believe that Kenneth posed
18 an immediate threat. Moreover, even if a fact finder concludes that Kenneth was pointing
19 the shotgun at Christopher and Taylor had probable cause to believe there was an immediate
20 threat, the fact finder could also conclude that it would have still been feasible for Taylor to
21 give a warning.[4] Without a threat of serious harm and with no warning given when one was
22 feasible, Taylor's use of force would be objectively unreasonable. See Mattos, 661 F.3d at
23 451 ("We have previously concluded that an officer's failure to warn, when it is plausible to
24 do so, weighs in favor of finding a constitutional violation."); see also Garner, 471 U.S. at
25 11-12, 105 S. Ct. at 1701 (officer may use deadly force if there is threat of serious harm "and

---

[4] Taylor concedes that whether it is feasible to give a warning "is a factually dependent test." Reply at 5.

- 5 -

1    if, where feasible, some warning has been given").

2        Taylor argues that we should discredit Christopher's affidavit, where he testifies that
3    his father was not pointing the shotgun at him, because no reasonable jury could believe him
4    given the other evidence in the record. See PSOF, ex. 1. He points to statements Christopher
5    made to the police immediately after his arrest, where he states he cannot recall what
6    happened, to the factual recitation of events at Christopher's plea hearing, where the
7    prosecutor indicated that Kenneth was pointing the gun at Christopher, and to the impact of
8    Christopher's blood alcohol level on his ability to accurately recall the details of that night.

9        We disagree that Christopher's statement "is so utterly discredited by the record that
10   no reasonable jury could have believed him." Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct.
11   1769, 1776 (2007). Taylor has not introduced any physical evidence corroborating his
12   recollection that Kenneth was pointing the gun at Christopher when he was shot. There may
13   be an explanation for why Christopher stated to the police that he could not recall the events
14   immediately after his arrest; there may not. There may be a reason why his attorney did not
15   object to the factual recitation at his plea hearing; there may not. The extent of Christopher's
16   intoxication may have negatively affected his perception; then again, maybe not. This
17   evidence does not render Christopher's testimony completely unbelievable. It does, however,
18   raise questions concerning Christopher's credibility, resolution of which is a job for the fact
19   finder.

20       In sum, because there are disputed issues of material fact as to whether there was
21   probable cause to believe that Kenneth posed an immediate threat and whether it was feasible
22   for Taylor to give a warning, we cannot conclude as a matter of law that Taylor's use of
23   deadly force was objectively reasonable.

### III

25       Taylor argues that even if his use of deadly force was a constitutional violation, and
26   even if we assume that Kenneth was not pointing the shotgun at anyone, he is nevertheless
27   entitled to qualified immunity because the right was not clearly established.

28       According to Taylor, a reasonable officer in his position would understand from

- 6 -

1 Garner that shooting an unarmed fleeing suspect was impermissible, but could have believed
2 that the use of deadly force against an armed suspect was lawful based on Brosseau,
3 Blanford, and Long. But the common thread in these three cases is not simply that the
4 suspects were armed. The officers in Brosseau and Blanford had given a number of warnings
5 and commands, which the suspects ignored. In Brosseau, the officer arrived at the suspect's
6 car, ordered him multiple times to exit the vehicle, and fired one shot after the suspect started
7 to drive away, presenting a risk to officers in the area. Brosseau v. Haugen, 543 U.S. 194,
8 196-97, 125 S. Ct. 596, 598 (2004). The court held that the officer was entitled to qualified
9 immunity because it was not clearly established that her conduct was impermissible. Id. at
10 201, 125 S. Ct. at 600. In Blanford, the officers were granted qualified immunity because

> the deputies would not have found fair warning in Garner, Graham, or any other Supreme Court or circuit precedent at the time that they could not use deadly force to prevent someone with an edged sword, which they had repeatedly commanded him to drop and whom they had repeatedly warned would otherwise be shot, from accessing a private residence.

14 Blanford v. Sacramento Cnty., 406 F.3d 1110, 1119 (9th Cir. 2005). And in Long, the officer
15 shot a suspect only after observing agitated behavior, "hear[ing] him threaten to shoot the
16 police, observ[ing] him carrying a .22 caliber rifle, and kn[owing] that he had previously shot
17 at a car full of people. . . earlier that night." Long v. City & Cnty. of Honolulu, 511 F.3d 901,
18 906 (9th Cir. 2007) (finding no constitutional violation and granting qualified immunity).

19 Here, however, there is no evidence that Kenneth was fleeing the scene. And there
20 is no evidence that any of the officers ever gave a verbal warning or command to drop the
21 gun before Taylor shot Kenneth. Viewing the facts in the light most favorable to plaintiffs,
22 a fact finder could conclude that Taylor did not have probable cause to believe that Kenneth,
23 who was holding a shotgun but not pointing it at anyone, posed an immediate threat of harm
24 to anyone. See Garner, 471 U.S. at 11, 105 S.Ct. at 1701 ("A police officer may not seize
25 an unarmed, nondangerous suspect by shooting him dead."). Moreover, a fact finder could
26 find that it was feasible for Taylor to have given a warning. See id. at 11-12, 105 S. Ct. at
27 1701 (officer may use deadly force "if, where feasible, some warning has been given").

28 Ultimately, if a fact finder concludes that Kenneth was not pointing the shotgun at

1 anyone, did not pose an immediate threat, and a warning could have been given, the
2 unlawfulness of Taylor's conduct would have been apparent "in the light of pre-existing law."
3 Hope v. Pelzer, 536 U.S. 730, 739, 122 S. Ct. 2508, 2515 (2002) (citation omitted).  No
4 reasonable officer reading Garner, Graham, Brosseau, Long, and Blanford would think it
5 lawful to seize a suspect by shooting him four times in the back without warning when he
6 was not fleeing, when he did not present an immediate threat of harm, and where a warning
7 could have been given.  It is beyond debate that such a use of deadly force would violate the
8 Fourth Amendment.  Accordingly, Taylor is not entitled to qualified immunity on the § 1983
9 excessive force claim as a matter of law.

## IV

**IT IS ORDERED DENYING** Roy Taylor's motion for summary judgment on qualified immunity (doc. 39).

DATED this 20th day of June, 2012.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge